

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EMN:JJD/SDD/MPC
F. #2012R00095

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 10, 2014

<u>By Hand and ECF</u>

The Honorable Sandra J. Feuerstein
United States District Judge
United States District Court
Eastern District of New York
1010 Federal Plaza
Central Islip, New York 11722

    Re: United States v. Justin Kaliebe
       <u>Criminal Docket No. 13-072 (SJF)</u>

Dear Judge Feuerstein:

    On February 8, 2013, the defendant Justin Kaliebe, also known as "Umar Abdur-Rahman," "Justin Russi" and "Omar," pled guilty to and Information charging two counts: (1) attempting to provide material support to terrorists in furtherance of a conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. § 2339A(a); and (2) attempting to provide material support to a foreign terrorist organization, al-Qaeda in the Arabian Peninsula ("AQAP"), also known as Ansar al-Sharia ("AAS")[1], in violation of 18 U.S.C. § 2339B(a)(1).  The defendant is scheduled to be sentenced by Your Honor on September 17, 2014.  The defendant's total offense level is 37, which provides for an advisory Guidelines range of 360 months to life imprisonment within Criminal History Category VI.  Because the counts of conviction have a combined statutory maximum of 30 years, the defendant's effective Guidelines range is 360 months.  (Pre-Sentence Investigation Report ("PSR") at ¶ 91).  For the reasons set forth below, the government does not oppose a modest downward departure due to certain mitigating factors relating to the defendant's age and physical condition, as well as the limited assistance he provided to the government.  The government respectfully submits that a sentence at or near 288 months' -- 24 years' -- incarceration would be sufficient to satisfy the statutory sentencing factors.

---

[1] AQAP and AAS are collectively referred to herein as "AQAP."

I. OFFENSE CONDUCT AND PROCEDURAL HISTORY

    A. Background on AQAP and AAS

AQAP is an Islamic-extremist terrorist organization, primarily operating in Yemen and Saudi Arabia. (PSR ¶ 4). It was formed in January 2009 and formally designated a foreign terrorist organization ("FTO") by the United States Department of State on January 19, 2010. AQAP is led by Nasir al-Wahishi, Usama bin Laden's former secretary in Afghanistan who reportedly escaped to Iran and was arrested and subsequently extradited to Yemen in 2003. (Id.). Al-Wahishi then reportedly escaped from a Yemeni prison in 2006 and spearheaded the merger of the Saudi and Yemeni branches of al-Qaeda in 2009. AQAP was also buttressed by Anwar al-Awlaki, a U.S.-born radical cleric, until Awlaki's death on September 30, 2011. Awlaki gained a following via his Internet sermons and was a member and leader of AQAP. (Id.).

In the past several years, AQAP has claimed responsibility for attempted terrorist attacks against the United States. For example, AQAP claimed responsibility for the attempted Christmas Day 2009 bombing of a Detroit-bound passenger plane from Europe by Umar Farouk Abdulmutallab. (PSR ¶ 5). In a video released days after the attempt, AQAP addressed the American people, threatening to "come for you to slaughter, and we have prepared for you men who love death like you love life." Further, AQAP later claimed responsibility for an October 2010 plot to send explosive-laden packages on United States-bound cargo flights. (Id.).

AQAP is adept at using technology and the Internet to popularize its message. Through AQAP's media wing -- Al-Malahem Media -- AQAP publishes an online, English-language magazine called *Inspire*. (PSR ¶ 6). In or about July 2010, AQAP published the first issue of *Inspire*. The cover page of the publication bears the "Al-Malahem Media" logo and name and, under the magazine's title, states "Periodical Magazine issued by the al-Qa'idah Organization in the Arabian Peninsula." In or about October 2010, AQAP released the second issue of *Inspire*, which included a feature article entitled "I Am Proud to be a Traitor to America," written by Samir Khan, another U.S. citizen who became an influential member of AQAP until his death in 2011. (Id.).

AQAP is considered to be one of the most active and lethal al-Qaeda affiliates and has expressed the intent to attack both the United States homeland and regional targets. (PSR ¶ 7). As noted above, AQAP was designated as an FTO on January 19, 2010. Subsequently, on October 4, 2012, AAS was designated as an FTO by the Department of State. (Id.). According to the Department of State, AAS is considered to be an alias used by AQAP in an attempt to rebrand itself to manipulate people into joining AQAP's terrorist cause. During 2012, AAS took responsibility for several attacks in Yemen, including attacks targeting the Yemeni military. For example, AAS claimed responsibility for a series of attacks in March 2012 that killed more than 100 people, including Yemeni soldiers. Additionally, in May 2012, AAS claimed responsibility for a suicide bombing that killed more than 100 Yemeni soldiers during a parade. (Id.).

2

B. Summary of Investigation

As set forth in the PSR and prior court filings, an investigation conducted by the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF") and the New York City Police Department, Intelligence Division ("NYPD Intel") revealed that between November 2011 and the defendant's arrest in January 2013, the defendant attempted to provide material to support to terrorists and AQAP by providing money and himself in support of violent extremist causes. (PSR ¶¶ 9-10). More specifically, the defendant attempted to travel from the United States to Yemen for the purpose of joining AQAP and waging violent "jihad." The defendant's efforts culminated in a January 21, 2013 attempt to board a flight from John F. Kennedy Airport ("JFK Airport") in Queens, New York to the Middle East for the purpose of joining AQAP. The defendant was arrested at JFK Airport and has remained in custody since then.

During the course of the investigation, law enforcement authorities employed a variety of investigative techniques, including the use of an undercover law enforcement operative ("UC-1"), and an online undercover law enforcement operative ("UC-2"). (PSR ¶ 9). UC-1 recorded numerous conversations with the defendant. During these conversations, the defendant demonstrated extensive knowledge regarding terrorist organizations, including AQAP and al-Qaeda, and current and former leaders of those terrorist organizations. For example, the defendant frequently referenced, and at times quoted, Anwar al-Awlaki, a member and leader of AQAP, as well as Omar Abdel Rahman (the "Blind Sheik"), Ayman al-Zawahiri (the current leader of al-Qaeda), and Usama Bin Laden. Further, the defendant demonstrated detailed knowledge of various terrorist attacks that were carried out by AQAP in Yemen, as well as attacks carried out by other al-Qaeda affiliates around the world. Additionally, when UC-1 allowed the defendant to use his computer, the defendant conducted Internet searches for materials including terrorist propaganda, such as lectures by Anwar al-Awlaki and video depictions of violent attacks and training exercises. Also, the defendant exchanged numerous emails with UC-2, wherein he affirmed his commitment to support terrorism and to travel to Yemen for the purpose of fighting jihad.

Several examples of the recorded meetings and emails are summarized below. With the exception of the April 4, 2012 conversation referenced below, where there was an equipment failure, all of the below conversations between the defendant and UC-1 were recorded with audio and/or video technology and copies of those recordings were provided to defense counsel.

C. Meetings with UC-1

Beginning in June 2011, the defendant had occasional contact with UC-1. Initially, these meetings were primarily casual, social contacts, but as UC-1 became aware of the defendant's self-proclaimed intent to support terrorist groups, their contact became more frequent and private. (PSR ¶ 11). The defendant began plotting to travel to Yemen to engage in jihad in approximately the fall of 2011. However, UC-1 did not learn of the defendant's commitment to supporting terrorism until approximately April 2012, during

private meetings. Some of the meetings took place in UC-1's home, where law enforcement authorities maintained a record of internet usage on UC-1's computer.

1. April 4, 2012 Meeting

On April 4, 2012, the defendant met UC-1 at a restaurant in Ronkonkoma, New York. (PSR ¶ 12). After leaving the restaurant, the defendant asked UC-1, who was represented to be of Yemeni descent, how he (the defendant) could travel to Yemen. UC-1 responded that one had to have connections to do that, and asked the defendant why he wanted to go there. The defendant replied that there were only two reasons to go to Yemen – to go to school or join a "group." When UC-1 asked the defendant which of those reasons was his reason, the defendant asked UC-1 to assure him that he was not going to "rat him out," and, after UC-1 assured him that he would not, the defendant indicated that he wanted to join a group "for the sake of Allah." Further, the defendant told UC-1 that he (the defendant) was "doing the J word" which UC-1 understood to be a reference to "jihad," or "holy war." Later that same day, the defendant told UC-1 that he had been planning to go to Yemen for a long time, and hoped to join the "mujahedeen," which is a term used to refer to a group of fighters. When UC-1 asked the defendant who his favorite sheik was, the defendant indicated that he loved the lectures of Anwar al-Awlaki. (Id.). As noted above, until his death, Awlaki was a member and leader of AQAP, who disseminated lectures on the internet urging young men to engage in violence in the cause of jihad.

2. April 9, 2012 Meeting

On April 9, 2012, UC-1 again met with the defendant and the defendant again brought up the topic of Yemen and asked UC-1 if he remembered their conversation from April 4, as described above. (PSR ¶ 13). The defendant stated that he had been planning to travel to Yemen since approximately October or November 2011, and had already collected some money for the trip. The defendant stated that he was planning to fly to Sanaa, Yemen, and from there take a car to Abyan province, which is an area of Yemen that he understood AQAP controlled. When UC-1 asked the defendant why he wanted to go to Yemen, the defendant stated that he wanted to join the mujahedeen and engage in jihad for the sake of Allah. (Id.). When UC-1 warned the defendant that he could die if he did so, the defendant indicated that he wanted to die so that he could go to paradise with the "Shaheed," which is an Arabic word for martyrs.

In addition, the defendant reiterated that Anwar al-Awlaki was his favorite scholar because Awlaki spoke English and because, when others had stopped talking about jihad following the attacks of September 11, 2001, Awlaki did not. Further, the defendant told UC-1 that he wanted to go to Yemen as soon as possible, and that he was going to try to do so at the end of the year, after he obtained his passport. The defendant suggested to UC-1 that UC-1 should travel with him, so that the defendant's travel would not seem suspicious. UC-1 responded that he knew people in Yemen, and agreed to assist the defendant. In later conversations, UC-1 indicated that he would also be willing to travel to Yemen with the defendant. (PSR ¶ 13).

4

On numerous occasions thereafter, the defendant used either UC-1's computer or his own computer, in UC-1's presence, to access videos and lectures relating to terrorist leaders such as Awlaki and Usama Bin Laden, as well as terrorist attacks and related propaganda. (PSR ¶ 14).

### 3. April 16, 2012 Meeting

For example, on April 16, 2012, the defendant used UC-1's computer to conduct a search regarding Awlaki. The defendant then played an Awlaki lecture entitled "Victory, Allah is Preparing us for Victory," which discussed martyrdom operations and jihad in Afghanistan and Iraq. (Id.). The defendant demonstrated familiarity with the lecture, and stated that it was one of his favorites. The defendant also stated that he had been "praying to go to Yemen" since 2011 – before he had ever discussed this topic with UC-1. (Id.).

### 4. June 4, 2012 Meeting

During another recorded meeting, which occurred on June 4, 2012, the defendant told UC-1 that AQAP member Samir Khan had inspired him, and that he was reading "Proud to be a Traitor," an article written by Khan, which explained how Khan got to Yemen by claiming he was going there to teach English. (PSR ¶ 15). During this conversation, the defendant discussed the relationship between AAS and al-Qaeda, noting that al-Qaeda is a network, and that the sub-branch of al-Qaeda is AAS. The defendant also asserted that al-Qaeda was no longer sending secret cells to Western countries, but instead was pursuing what the government refers to as "lone wolf terrorism." When UC-1 asked the defendant whether "lone wolf terrorism" was what they (he and the defendant) were doing, the defendant responded no, and cited Abdulmutallab, the attempted Christmas Day 2009 underwear bomber described above, as an example of a "lone wolf." (Id.). The defendant then stated, "I don't know what they'd call us, to kill, maim and kidnap in foreign countries, conspiracy to do that, that's basically the crime that they would charge people like us with." The defendant's reference was clearly to 18 U.S.C. § 956, which makes it a crime to "conspir[e] to kill, kidnap, maim, or injure persons or damage property in a foreign country," and is frequently used to charge terrorists. (Id.). Indeed, it is the predicate charge for Count One of the Information to which the defendant pled guilty.

Also during the June 4, 2012 recorded meeting, the defendant engaged in a discussion regarding who the defendant expected to fight once he arrived in Yemen, stating that he expected to fight primarily "the Yemeni army." (PSR ¶ 15). However, the defendant continued, "I would say, those who are fighting against the Sharia of Allah . . . whether it's the U.S. drones or the, their puppets, in the Yemeni army . . . or, who knows, if American agents or whatever, U.S. Special Forces [U/I] who they got over there." When UC-1 asked the defendant whether he was afraid of dying, the defendant responded, "I wanna . . . It's what anyone would want, any believer would want." (Id.).

5. June 25, 2012 Meeting

One of the most chilling meetings with the defendant occurred on June 25, 2012. During that conversation, the defendant discussed how Humam al-Bilawi, also known as "Abu Dujana al-Khurasani" (hereinafter "Abu Dujana"), an al-Qaeda terrorist, carried out a suicide attack at Forward Operating Base Chapman in Khost, Afghanistan on December 30, 2009. The defendant explained to UC-1 how Abu Dujana pretended to be willing to work with the Jordanian intelligence agency and the U.S. government, but, after gaining access to Base Chapman, detonated a suicide bomb, killing seven Americans.[2] Specifically, the defendant stated that Abu Dujana "end[ed] up doing a martyrdom operation . . . on the CIA Bin Laden team . . . and kill[ed] them all." While the defendant discussed Abu Dujana's suicide attack, he was laughing.

6. July 9, 2012 Meeting

On July 9, 2012, during another recorded meeting between the defendant and UC-1, UC-1 asked the defendant what he would tell an overseas "brother," if asked why he wanted to travel to Yemen. (PSR ¶ 16). The defendant responded that, as a Muslim, there "is an obligation on him, even though I'm in America, to help my brothers out overseas with my life." (Id.). When UC-1 asked the defendant what he meant by "helping," the defendant responded that "[h]elping them out as in fighting to get the [inaudible] out of their land." When UC-1 asked the defendant who had inspired him, the defendant stated that he was inspired by several sheiks, including Usama bin Laden, who the defendant referred to as "Sheik Usama." The defendant praised bin Laden because he "showed how he could bring an entire nation to its knees."

D. Email Communication with UC-2

In October 2012, the defendant asked UC-1 whether he would contact an overseas "brother" who could help arrange for the defendant to travel to Yemen. (PSR ¶ 17). UC-1 then introduced the defendant to UC-2, who purported to be located in Yemen. Between November 2012 and January 2013, the defendant engaged in email communication with UC-2. Initially, on November 14, 2012, UC-2 sent an email to UC-1, which was shown to the defendant. A portion of the email from UC-2 was specifically directed to the defendant, and related to the subject of jihad. UC-2 wrote, in part, "I promise . . . that I will answer all of the questions you have so that you are certain of your decision."

On November 15, 2012, the defendant sent an email to UC-2 in response, stating that he was "overwhelmed with joy" when UC-1 showed him the initial email. (PSR ¶ 18). The defendant also provided some background information about himself, so that UC-2 would be "confident" in him. The defendant stated that "since [he] became a Muslim

---

[2] The details of the suicide bombing attack at Forward Operating Base Chapman have been well-publicized. See, e.g., Reconstructing the CIA Bombing, WASHINGTON POST, Jan. 9, 2010, available at http://www.washingtonpost.com/wp-dyn/content/graphic/2010/01/09/GR2010010902557.html.

6

[he'd] wanted to join the Mujahedeen and fight Fee Sabell Lillah," which literally means "in God's way" and is sometimes used to reference acts of charity. Additionally, the defendant wrote that he had been dreaming about joining the Mujahedeen for two years, and he wanted to do so despite the fact that he would "risk torture, imprisonment, or death, but this is the path I want to take[.]" The defendant also asked when he could give "bayat," which is an Islamic term meaning an oath of allegiance to a leader. (Id.).

In early December 2012, the defendant and UC-2 continued to exchange emails regarding the defendant's proposed travel to Yemen in January 2013. (PSR ¶ 19). For example, in a December 9, 2012 email, the defendant agreed he would travel separately from UC-1 and stated that he wanted to travel as soon as possible. Additionally, the defendant quoted from a recorded speech by Awlaki, stating that "martyrdom is like a tree, and fruits grow on this tree" and that "the tree of martyrdom in the Arabian Peninsula has ripened fruits on it, and the time has come to reap those fruits." (Id.).

E. Statements of Intent and Attempted Travel

During November and December 2012, the defendant took a series of specific steps in an effort to reach Yemen in pursuit of his goal of supporting AQAP, including, among other things, applying for a United States passport on November 23, 2012 (which he received on December 22, 2012) and, as discussed below, using an online booking agent to purchase an airline ticket to Oman. (PSR ¶ 20). In a recorded meeting on December 10, 2012, the defendant used UC-1's computer to research airfare to Oman, from where he was planning to travel overland to Yemen. (PSR ¶ 21). The next day, the defendant purchased a ticket, to depart from JFK Airport on January 21, 2013 and arrive in Muscat, Oman, via London and Bahrain, on January 22, 2013. Because the ticket cost less than he had anticipated, the defendant emailed UC-2 that he would have more than $600 to give to the "brothers" and offered to bring "things of value that would fit with [his] disguise." (Id.).

On December 26, 2012, the defendant swore "bayat," that is he pledged his loyalty to AQAP, in an email sent to UC-2, writing:

> I pledge my loyalty, allegiance and fidelity to the Mujahedeen of Al-Qaa'idah in the Arabian Peninsula and its leaders, Shaykh Abu Baseer Nasir Al-Wuhayshi and Shaykh Ayman Al-Zawahiri, hafidhahum Allah! May Allah accept this from me and may he allow me to fight in his cause til the day that I leave this dunya [material world].

(PSR ¶ 22). Ominously, the defendant made explicit that "there are no limitations to what I'm willing to do when I get there." (Id.).

On January 18, 2013, three days before his scheduled travel, UC-1 and the defendant met and UC-1 gave the defendant an opportunity to change his mind and not travel to Yemen. UC-1 emphasized that there were other ways to serve Islam, than fighting jihad, such as spreading the religion, teaching and performing charitable acts. In response, the defendant rejected UC-1's advice and acknowledged, laughing, that "there is a way out . . .

7

but for [him], the only way out is martyrdom." The defendant stated that his "standards," or role models, were not the Muslims in the mosques, but instead terrorist leaders and Islamic icons who have been embraced by certain extremists: Khalid bin al-Walid,[3] Abu Dujana,[4] Umar Ibn al-Khattab,[5] Abu Mus'ab al-Zarqawi,[6] Sheik Anwar al-Awlaki,[7] and Sheik Usama.[8]

With respect to the references to al-Awlaki and bin Laden, both of whom were killed in 2011, the defendant stated to UC-1 that both of these terrorist leaders "bore witness to the truth with their blood." During that same meeting, the defendant also acknowledged that he understood that he had the opportunity to remain in the United States and "live a wonderful life," including going to college and getting a job in a medical laboratory, where he would make a lot of money; however, the defendant stated that he would prefer going to prison than living a normal life. Finally, the defendant stated that "one of my highest goals in life is to fight with the mujahedeen. And I define victory as martyrdom . . . or victory on the ground."

On January 21, 2013, the defendant traveled from Long Island to JFK Airport, presented his United States passport and an airline ticket for the flight to Muscat, Oman, and was issued a boarding pass. (PSR ¶ 23). The defendant then passed through airport security, went to the gate for the flight, and, when the flight was called, attempted to board the airplane. At that time, the defendant was arrested and taken into custody by the JTTF and NYPD Intel. (Id.).

---

[3] "Khalid bin al-Walid" was a notable historical ancient-Islam military commander.

[4] As noted above, "Abu Dujana" is the alias of the Jordanian al-Qaeda operative who carried out the December 30, 2009 suicide attack that killed seven Americans in Afghanistan.

[5] "Umar Ibn al-Khattab" is a reference to a historical Islamic "Caliph," or supreme leader.

[6] "Abu Mus'ab al-Zarqawi" was the leader of the Tawhid and Jihad group, a predecessor to al-Qaeda in Iraq. Al-Zarqawi, who was also known as "Shaykh of the Slaughterers," recorded himself beheading people. He was killed in 2006 in combat in Iraq.

[7] As discussed above, "Sheik Anwar al-Awlaki" was a Yemeni-American radical cleric and a member and leader of AQAP who was killed in Yemen in 2011.

[8] "Sheik Usama" is a reference to Usama bin Laden, the former leader of al-Qaeda who directed numerous terrorist attacks, including the September 11, 2001 attacks against the United States.

F.  Limited Cooperation

Following his arrest, the defendant met with the government several times and during those meetings he detailed both his own criminal activity, as well as criminal activity engaged in by his associates, with whom he plotted to travel to Yemen for the purpose of committing jihad.  On February 8, 2013, the defendant pled guilty before United States Magistrate Judge A. Kathleen Tomlinson to a two-count Information charging him with one count of attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a), and one count of attempting to provide material support to a designated FTO, in violation of 18 U.S.C. § 2339B(a)(1).  (PSR ¶¶ 1-3).  The defendant pled guilty pursuant to a cooperation agreement with the government, wherein he agreed, inter alia, to "provide truthful, complete and accurate information and [] cooperate fully with the [United States Attorney's Office]," including attending meetings with the government, being debriefed regarding his knowledge of criminal activities, furnishing documents and materials relevant to the investigation, participating in undercover activities, not revealing his cooperation or information to third parties, and testifying, as requested by the government.  However, soon after pleading guilty, the defendant, both through counsel and directly during meetings with the government, repeatedly and emphatically stated that he was unwilling to cooperate with the government, would not meet with the government any further, would not provide any information to the government and would not testify against anyone.  Thereafter, on April 15, 2014, the government notified the defendant that he was in breach of the cooperation agreement and that the government therefore would not file a motion pursuant to U.S.S.G. § 5K1.1 on his behalf at sentencing.  The defendant did not waive his right to appeal his sentence in the agreement or otherwise in connection with his plea.  While the defendant certainly did not provide substantial assistance to the government, the information he did provide was of some limited value to an important national security investigation.

## II.  GUIDELINES CALCULATION

As noted above, the Probation Department has determined that the defendant's total offense level is 37, which provides for an advisory Guidelines range of 360 months to life imprisonment within Criminal History Category VI based on the application of the Terrorism Enhancement.  (PSR at ¶¶ 27-40, 91).  The government concurs with this calculation.  Because the counts of conviction have a combined statutory maximum of 30 years, the defendant's effective Guidelines range is 360 months.  As set forth further below, the defendant disputes the range set forth in the PSR.

## III.  APPLICABLE LAW

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the

Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV. ANALYSIS

A. Disputed Guidelines Range

On April 14, 2014, the defendant submitted a sealed sentencing memorandum ("Def. Mem.") wherein he requested a sentence of 36 months' incarceration, which represents one-tenth of the bottom of the applicable advisory Guidelines range. (Def. Mem. at 21). The defendant claims that this drastic sentencing reduction is warranted in light of his personal history, including his upbringing and mental and physical limitations. (Id.). Additionally, the defendant challenges the Guidelines calculation in the PSR, claiming that the application of the Terrorism Enhancement is inappropriate in this case. (Def. Mem. at 3-7). The defendant also argues that the Court should not sentence the defendant to

consecutive terms for his conviction on the two counts of the Information, each of which carries a statutory maximum sentence of 15 years. (Id. at 18-20).

The Court should reject the defendant's objections, and should adhere to the Guidelines calculation in the PSR. It is well-settled that the Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the Guidelines range. Kimbrough v. United States, 552 U.S. 85, 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)). Here, the government concurs with the Probation Department's calculation and respectfully submits that the defendant's effective advisory Guidelines range is 360 months' incarceration, based on a total adjusted offense level of 37, in Criminal History Category VI, with a statutory maximum sentence of 30 years' imprisonment. (PSR at ¶¶ 90-91). Nevertheless, based on the unusual circumstances presented, which include the defendant's age and physical condition as set forth in detail elsewhere and not repeated here, as well as the limited assistance he provided to an extremely important national security investigation, the government recommends a modest downward departure to a sentence at or near a term of 288 months' imprisonment.

1. The Terrorism Enhancement Applies to Kaliebe's Conduct

As an initial matter, the Terrorism Enhancement clearly applies to the defendant's offense conduct. Section 3A1.4 of the Sentencing Guidelines applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4 & comment n. 1. Section 2332b(g)(5), in turn, provides that:

> [T]he term "Federal crime of terrorism" means an offense that -
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of . . . 2339A (relating to providing material support to terrorists), [or] 2339B (relating to providing material support to terrorist organizations).

18 U.S.C. § 2332b(g)(5). The Second Circuit has held that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant's particular motive." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010). "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." Id. By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." Id. (emphasis in original). In this case, both counts of conviction - counts one and two of the Information - charge violations enumerated

11

in 18 U.S.C. § 2332b(g)(5)(b). Moreover, as set forth in detail above and in the PSR, the defendant's crimes were clearly "calculated to influence or affect" government conduct, and were undertaken expressly in support of terrorists and terrorist organizations. Indeed, the defendant specifically contemplated the possibility of fighting U.S. troops and acting in contravention of U.S. interests abroad. (See, e.g., PSR ¶ 15).

2. The Sentences on Each Count Should Run Consecutively to Arrive at an Appropriate Sentence

In addition, while acknowledging that the Court has the discretion to impose either consecutive or concurrent sentences on the two counts, the defendant incorrectly claims that "U.S.S.G. § 5G1.2 would seem to require concurrent sentencing[.]" (Def. Mem. at 18-19). The plain language of 18 U.S.C. § 3584 and U.S.S.G § 5G1.2(c)-(d) dictates the opposite result. The defendant's advisory Guidelines range is 360 months to life, which at the low end is double the statutory maximum sentence for each count. In light of the § 3553(a) factors discussed below, concurrent sentences on the two counts, with a maximum sentence of 15 years' imprisonment, would not be appropriate and would result in an unwarranted windfall for the defendant of a sentence that is half of the low-end of his advisory Guidelines range.

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999), the case cited by the defendant, is inapplicable to this case. In Rahman, the Second Circuit noted that while § 3584 prohibits consecutive sentences for an attempt and the substantive offense that was the object of the attempt, it does not prohibit consecutive sentences for attempts and conspiracies with the same object. Id. at 158 n. 36. Here, the government's request for consecutive sentences is even stronger because it involves two counts of conviction for attempts to commit two different substantive crimes; Count One relates to an attempt to violate 18 U.S.C. § 956, pursuant to 18 U.S.C. § 2339A(a), and Count Two relates to an attempt to provide material support to AQAP, pursuant to 18 U.S.C. § 2339B(a)(1). Therefore, in order "to produce a combined sentence equal to the total punishment," see U.S.S.G. § 5G1.2(d), the Court should exercise its discretion and sentence the defendant to consecutive terms of prison on Counts One and Two.

B. Statutory Sentencing Factors under 18 U.S.C. § 3553(a)

1. Seriousness of the Offense

It is self-evident that the nature of the defendant's conduct is extremely serious. As he admitted during his guilty plea, the defendant attempted to travel to Yemen for the purpose of joining AQAP and committing acts of international terrorism. While such conduct would be serious under any circumstances, the defendant's conduct is made more serious in light of his statements during the recorded conversations with UC-1, and his written admissions during email correspondence with UC-2. During those meetings and emails, the defendant repeatedly expressed his desire to join AQAP for the purpose of fighting jihad and, if necessary, martyring himself. For example, during the June 4, 2012 meeting cited above, the defendant stated that he was not only willing to fight the Yemeni

12

army, but anyone who was "fighting against the Sharia of Allah . . . whether it's the U.S. drones or the, their puppets, in the Yemeni army . . . or, who knows, if American agents or whatever, U.S. Special Forces [U/I] who they got over there." The defendant also demonstrated deep reverence for terrorist leaders and operatives, including bin Laden, al-Awlaki, al-Zawahiri and Abu Dujana. As set forth above, on June 25, 2012, the defendant laughed while he described a suicide attack by al-Qaeda operative Abu Dujana on Americans in Afghanistan. Months later, when UC-1 gave the defendant another opportunity to change his mind and abandon his plans to travel to Yemen, the defendant vehemently reaffirmed his desire to join AQAP and fight jihad, and reiterated his admiration for Abu Dujana and other terrorist leaders, including bin Laden. Further, when the defendant sent UC-2 an email to declare "bayat," he pledged his "loyalty, allegiance and fidelity" to AQAP and its leaders, al-Wuhayshi and al-Zawahiri. These statements demonstrate the defendant's state of mind and intent, and his sincere desire to join AQAP and fight jihad. The statements also highlight the seriousness of these offenses and the future dangerousness presented by the defendant.

In an attempt to undermine the seriousness of the defendant's conduct, defense counsel argues that the defendant never reached Yemen or engaged in violent jihad. (Def. Mem. at 5). While this is true, this fact does not warrant anything approaching the lenience requested by the defendant. First, the only reason the defendant did not travel to Yemen was because of the intervention of law enforcement authorities. The defendant took every necessary step to travel to Yemen, including saving money, purchasing a plane ticket, traveling to JFK, passing through security, and attempting to board the airplane. Second, had the defendant reached Yemen and joined AQAP, he likely would be facing even more serious charges and a more severe sentence. Third, although he was ultimately unsuccessful in his attempt to join AQAP, the defendant's actions were undoubtedly intended to support AQAP's mission of waging violent jihad against those they consider to be the enemies of Islam, including Americans. Moreover, terrorist organizations such as AQAP are increasingly recruiting American citizens to support their cause and sustain their operations. Obviously, American citizens, such as the defendant, who can travel from the United States to receive terrorism training, and then return to the United States are particularly concerning and present a grave danger to the United States homeland.

Further, the defendant incorrectly claims that UC-1 never attempted to dissuade him from traveling to Yemen to join AQAP. (Def. Mem. at 2). As set forth above, on January 18, 2013, several days before his scheduled travel to the Middle East, the defendant was given an opportunity to change his mind. UC-1 discussed with the defendant that there were many other ways of serving Islam than jihad, such as teaching or helping others. The defendant responded with a diatribe wherein he emphatically affirmed his commitment to fighting jihad and becoming a martyr, and saluted his terrorist icons, including bin Laden, Awlaki, Zarqawi and Abu Dujana. The defendant's repeated references to and glowing admiration for the suicide bomber, Abu Dujana – he went so far as to refer to himself as Abu Dujana during the January 18, 2013 meeting, are particularly troubling. These statements by the defendant highlight both the seriousness of this offense, and the imminent danger he would present if given the lenient sentence he requests.

13

Accordingly, the "nature and circumstances of the offenses" strongly warrant a sentence at or near 288 months in prison, pursuant to § 3553(a)(1).

2. History and Characteristics of the Defendant

Although the defendant has no criminal record, the Court should not consider this to be a significant mitigating factor in determining his punishment. As noted previously, the terrorism enhancement under U.S.S.G. § 3A1.4 mandates that the defendant's criminal history be increased to the maximum, Category VI. This provision of the Guidelines embodies the judgment that terrorism offenses are particularly dangerous and deserve severe punishment. Furthermore, when assessing the need to protect the public in crafting an appropriate sentence, the Second Circuit has recognized that terrorists present a special risk of danger because of their often fanatical devotion to violent causes. See United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) ("Even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."). The defendant fits this description in Meskini perfectly.

The defendant requests a drastic sentencing reduction based almost entirely on his history and characteristics, pursuant to § 3553(a)(1), to the exclusion of all of the other factors that Congress has instructed sentencing courts to consider, including the serious nature of this offense and the need for the sentence to protect the public and deter terrorism offenses. While the defendant's sentencing memorandum characterizes his request for a 36-month sentence as a downward departure motion, it is essentially a request for a below-Guidelines sentence based on the following grounds: (1) the defendant's diminished capacity, resulting from the defendant's alleged mental, emotional and physical condition (Def. Mem. at 7-17); and (2) the defendant's aborted cooperation with the government (id. at 15). Whether considered as a request for a downward departure or a non-Guidelines sentence, the defendant's history and characteristics plainly do not warrant a sentence of 36 months. While the Court must consider the defendant's characteristics, including his age, upbringing, mental and physical health, and incomplete cooperation, these factors are outweighed by the seriousness of his conduct, and the need for the sentence to fulfill the objectives of § 3553(a)(2)(A)-(C), which are discussed below, and do not warrant anything remotely approaching the 36-month sentence requested by the defendant.

a. The Defendant Did Not Suffer from Diminished Capacity

First, the defendant's claim that he should receive a reduced sentenced because of his diminished capacity is without merit and should be rejected. The defendant's diminished capacity claim relies primarily on the opinions of Dr. Alexander Sasha Bardey, which were set forth in his March 25, 2014 report (the "Bardey Report"). Dr. Bardey opines that the defendant suffered from autism spectrum disorder and various physical ailments and concludes: "Though not exculpatory, these important psychological, medical and developmental factors should be considered as mitigating his degree of responsibility. It is my opinion with a reasonable degree of medical certainty that Mr. Kaliebe was, at the time of the offense, functioning under a diminished capacity." (Bardey Report at 38).

14

As an initial matter, the timing of the defendant's diagnosis is curious. Despite the fact that the defendant has undergone and received extensive physical and mental health evaluation and treatment throughout his life, he apparently was never diagnosed with autism or "diminished capacity" until after his arrest, guilty plea and decision to violate the cooperation agreement. The diagnosis is even more questionable in light of the fact that the defendant was not only regularly treated by physicians, such as Dr. Jason Hitner, but spent a significant portion of his life living with his stepfather, who is a practicing physician. Yet, according to the Bardey Report, the defendant was diagnosed with autism spectrum disorder for the first time by his family physician in June 2013, some six months after his arrest.

Further, the defendant fails to satisfy the Guidelines requirements for a reduction of sentence based on diminished capacity. The pertinent Guidelines policy statement provides, in relevant part, that "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. Additionally, Application Note 1 states, "[f]or purposes of this policy statement, '[s]ignificantly reduced mental capacity means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power to reason; or (B) control behavior that the defendant knows is wrongful." Id. app. n. 1. These elements are not satisfied in this case.

Here, nothing in the record suggests that the defendant was unaware that his conduct was wrongful. To the contrary, the defendant made repeated statements to the undercover law enforcement officers in this case regarding the conduct he was contemplating and he acknowledged that what he was doing was criminal, he could be arrested, and he could spend the rest of his life in prison. Notwithstanding his clear-eyed understanding of the potential consequences, the defendant continued to engage in the charged terrorism offenses. As set forth above, in one recorded conversation, which took place on June 4, 2012, the defendant actually discussed what crimes he would be charged with "to kill, maim and kidnap in foreign countries, conspiracy to do that, that's basically the crime that they would charge people like us with." The defendant's reference was to 18 U.S.C. § 956, which makes it a crime to "conspir[e] to kill, kidnap, maim, or injure persons or damage property in a foreign country," and is frequently used to charge terrorists, including the underlying crime of Count One of the Information against the defendant.

Additionally, the Bardey Report points to the defendant's prior testing that purportedly demonstrates his low level of intelligence. However, the defendant's most recent IQ test, which was administered by Dr. Rebecca E. Barnetter from the Bureau of Prisons, on September 11, 2013, and included in her report (the "Barnetter Report"), found the defendant to be of average intellectual ability; a finding conceded by Dr. Bardey in his report, despite his ultimate opinion that the defendant operated with "diminished capacity." (Barnetter Report at 7; Bardey Report at 38).

Further, Dr. Bardey's opinions are undermined because they are based almost exclusively on the self-serving statements made by the defendant and his understandably well-meaning family members. The Bardey Report relies on anecdotal evidence regarding the defendant's upbringing and his mental condition, yet ignores the objective evaluation conducted by Dr. Barnetter. Additionally, Dr. Bardey accepts the defendant's self-serving statements regarding the underlying offenses, in particular, the statements regarding the defendant's interaction with UC-1. However, despite the fact that the defendant was provided with copies of the recordings between the defendant and UC-1, many of which are referenced herein, and FBI reports summarizing the interviews, Dr. Bardey apparently never considered any of the recordings or reports in forming his opinion. Had Dr. Bardey reviewed the recordings and reports, it would have been evident to him that the defendant lied repeatedly during his interview regarding his interactions with UC-1.

For example, contrary to the subjective assessments of the defendant on which the Bardey Report heavily relies, the recordings do not show the defendant as a passive, easily manipulated individual, but rather an enthusiastic and highly motived jihadist. Moreover, contrary to the defendant's claim to Dr. Bardey that UC-1 yelled at the defendant and demanded that he give him all his money (Def. Mem. at 12; Bardey Report at 26), a thorough review of the recordings fails to produce any instances in which UC-1 yelled at the defendant, regarding money or otherwise. At the very least, these recordings should have been reviewed to evaluate the veracity of the defendant. More importantly, had Dr. Bardey reviewed the recordings, he would have observed the leadership role the defendant took in these crimes. In fact, the recordings show that the defendant was educating UC-1 regarding the teachings of Islamic militants such as Anwar al-Awlaki and encouraging UC-1 to listen to al-Awlaki's lectures on the Internet, not the other way around. On the recordings, the defendant stated that he had wanted to travel overseas and fight jihad ever since he converted to Islam, more than two years prior to his arrest, and long before he met UC-1. Additionally, both the recordings and the defendant's admissions during interviews with the government establish that the defendant had been planning to travel to Yemen to fight jihad since the Fall of 2011, months before the defendant first discussed the matter with UC-1 in April 2012.

Finally, Guideline 5K2.13 states, in relevant part, that the Court may not depart below the Guidelines range under this Guideline if the "facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." U.S.S.G. § 5K2.13. Given that the defendant pled guilty to two terrorism offenses and, during numerous recorded conversations, expressed his desire to travel overseas to join AQAP, fight jihad and martyr himself, a substantial departure under this Guideline is plainly inappropriate.

In sum, because the Bardey Report relied on dubious self-serving statements and failed to include an analysis of the recordings and other materials, its conclusions are deeply flawed. As such, the court should reject Dr. Bardey's opinion that the defendant was functioning at diminished capacity at the time of the instant offenses.

16

### b. Defendant's Mental and Physical Health

Similarly, the defendant argues that he is entitled to a reduced sentence as a result of his physical and mental condition. (Def. Mem. at 14). In support of his position the defendant cites U.S.S.G. 5H1.3 and 5H1.4. These Guidelines, however, militate against, rather than in favor of, a departure. "Generally, the most appropriate use of specific offender characteristics is to consider them not a reason for a sentence outside the applicable guideline range but for other reasons, such as determining the sentence within the applicable guideline range[.]" U.S.S.G. Ch. 5 Pt. H Introductory Commentary. Thus, while the government does not dispute that the defendant suffers from various medical conditions, there is no evidence to establish that these conditions affected, in any way, the defendant's ability to distinguish right from wrong, or that the defendant suffered from a diminished mental or physical capacity that contributed to the defendant's commission of the offense. To the contrary, as set forth above, the evidence in this case, including the voluminous recordings of the defendant, clearly show the defendant as a highly motivated participant in the charged offenses.

Further, Guideline 5H1.3 notes that mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. 5H1.3. The Bardey Report, upon which the defendant again relies, fails to include sufficient objective testing or analysis with respect to the mental condition of the defendant. There is no indication in the Bardey Report, the PSR or other documentation that the defendant's mental and emotional limitations are so severe or "are present to [such] an unusual degree" that they warrant the degree of sentencing reduction requested by the defendant. U.S.S.G. 5H1.3.

The defendant's argument that a downward departure should be granted on the basis of [his] "physical condition" should be rejected as well. (Def. Mem. at 14). In support of his argument, the defendant cites to U.S.S.G. § 5H1.4, which states:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the Guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

The defendant's physical condition does not remotely justify a downward departure of the magnitude sought by the defendant. The defendant was described by Dr. Bardey as a

"Caucasian male of average height and weight . . . with a short moustache and beard." (Bardey Report at 32). While he undeniably suffers from certain conditions, the defendant's overall physical condition, though relevant and somewhat mitigating, does not obviate the need for just punishment in this case.

### c. Defendant's Aborted Cooperation

Additionally, the defendant seeks a reduced sentence based on his aborted cooperation with the government. (See Def. Mem. at 1 and 15). Following his arrest, the defendant proffered with the government several times and provided the government with historical information regarding criminal activity within the Eastern District of New York, However, in April 2013, the defendant informed the government that he was no longer willing to cooperate, refused to participate in any further debriefings with the government, would not provide additional information about criminal conduct about which he had knowledge, and would not testify in related proceedings.

The defendant's sentencing memorandum requests that the Court consider his cooperation, even though it is undisputed that he breached his cooperation agreement and should not receive a § 5K1.1. letter. While the Court should consider this factor, the government respectfully submits that it should be given little weight.

Accordingly, the government respectfully submits that the defendant's "history and characteristics" described above warrant a moderate departure of six years from the advisory Guidelines sentence of 360 months' incarceration. A sentence at or near 288-months (24 years) is appropriate in this case, pursuant to § 3553(a)(1).

### 3. Sentence Must Reflect Seriousness, Promote Respect for the Law, Provide Just Punishment, Afford Deterrence and Protect the Public

The Court must next consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). The defendant's sentencing memorandum ignores these factors, which weigh heavily in favor of a sentence at or near 288 months in prison.

First, with respect to § 3553(a)(2)(A), attempting to provide material support to terrorists and to a foreign terrorist organization are serious offenses and need to be adjudicated in a manner that will promote respect for the law and provide just punishment. A sentence of 288 months would accomplish these objectives.

Second, in regard to § 3553(a)(2)(B), the Court's sentence should afford adequate deterrence to terrorism, both specific deterrence to this defendant, and general deterrence to other individuals who might be inclined to engage in terrorism offenses against the United States. A sentence of 288 months in prison would send a strong message that

18

attempts to provide material support to terrorists and terrorist organizations such as AQAP and other al-Qaeda affiliates will be met with severe consequences.

Third, pursuant to § 3553(a)(2)(C), it is essential that the Court's sentence "protect the public from further crimes of the defendant." When evaluating the defendant's future dangerousness, and the need for the Court's sentence to protect the public from further crimes of the defendant, the defendant's offense conduct and post-arrest conduct are both relevant. When the defendant was first arrested, and after consulting with his prior defense counsel, the defendant elected to meet with the government and proffer regarding his knowledge of other individuals who shared his ideological views; namely, those committed to jihad. However, after entering this agreement, the defendant elected to breach his cooperation agreement with the government and informed the government, on several occasions, that he was unwilling to testify against fellow jihadists. The incapacitation that 24 years' imprisonment would provide will help protect the public and achieve the objective of this statutory sentencing factor.

### IV. Conclusion

The Court is presented with two competing descriptions of the defendant. The defense attempts to garner the Court's sympathy for the defendant, based on a narrative spun by Dr. Bardey from the self-serving statements of the defendant and his family members. The government relies instead on the defendant's offense conduct and his own statements, which were captured with audio recordings, video recordings and email, wherein the defendant, a self-admitted jihadist, plotted for over a year to travel to Yemen, join AQAP and fight with terrorists who are sworn enemies of the United States and its allies, as well as his post-arrest conduct. Accordingly, the government respectfully submits that a sentence at or near a term of 288 months' imprisonment is necessary and appropriate to fulfill the objectives of sentencing.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /S/ John Durham
John J. Durham: (631) 715-7851
Seth D. DuCharme: (718) 254-6021
Michael P. Canty: (718) 254-6490
Assistant U.S. Attorneys

cc: Anthony La Pinta, Esq. (By email)
USPO Steven Guttman (By email)